## SAFE HARBOR WATER POWER CORPORATION v. FEDERAL POWER COMMISSION.

### SAME v. UNITED STATES et al.
(two cases).

Nos. 7544, 7688, 7689.

Circuit Court of Appeals, Third Circuit.

Decided Dec. 2, 1941.

Charles J. Markell, of Baltimore, Md. (George T. Hambright, of Lancaster, Pa., and Edwin M. Sturtevant, of Baltimore, Md., on the brief), for petitioner in No. 7544 and appellant in Nos. 7688 and 7689.

Richard J. Connor, Asst. Gen. Counsel, of Washington, D. C. (William S. Youngman, Jr., Gen. Counsel, and Milford Springer, Atty., Federal Power Commission, both of Washington, D. C., on the brief), for respondent in No. 7544.

Sidney J. Kaplan, Sp. Asst. to Atty. Gen. (Francis M. Shea, Asst. Atty. Gen., Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., and Martin Norr, Sp. Atty., Department of Justice, of Washington, D. C., on the brief), for appellees in Nos. 7688 and 7689.

Before BIGGS, MARIS, CLARK, JONES, and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

We are here concerned with a petition to review an order of the Federal Power Commission issued by it on June 11, 1940 allegedly pursuant to Section 20, Part I of the Federal Power Act.[1] The petitioner, Safe Harbor Water Power Corporation, operates a hydroelectric power plant on the Susquehanna River at Safe Harbor, Pennsylvania, under a fifty year license issued to it in 1930 by the Federal Power Commission. Under a long term contract expiring in 1980, Safe Harbor sells all of the electrical energy created by it to its two parent companies, Consolidated Gas Electric Light and Power Company, of Baltimore, at Baltimore, Maryland, and the Pennsylvania Water and Power Company, of Holtwood, Pennsylvania. The two last named companies own all of the stock of the petitioner. We will refer to the Consolidated Gas Electric Light and Power Company as the Maryland Company and The Pennsylvania Water and Power Company as the Pennsylvania Company. The Maryland Company and the Pennsylvania Company are entitled to take electric power from Safe Harbor in the direct proportion of their respective stock ownerships; viz., the Maryland Company is entitled to two-thirds and the Pennsylvania Company is entitled to one-third of the electrical energy produced. The Pennsylvania Company in turn sells the electric energy which it purchases to the Maryland Company and others at wholesale.[2] The greater part of the electricity created by Safe Harbor goes into interstate commerce. Though title to some of it passes from Safe Harbor to the Pennsylvania Company in Pennsylvania and is not in interstate commerce, we think that the assertion of the Federal Power Commission that the Safe Harbor hydroelectric project in Pennsylvania is operated as part of a large integrated interstate electric system is substantially correct. A goodly portion of the

---

[1] The 1935 Federal Power Act, 49 Stat. 863, 16 U.S.C.A. § 791a et seq., Part I of which is the 1920 Federal Water Power Act, 41 Stat. 1063–1077, 16 U.S.C.A. § 791.

[2] These others include the cities of Lancaster, Coatesville and York, Pennsylvania.

electricity manufactured by Safe Harbor enters Maryland and the District of Columbia.[3]

The Commission fixed Safe Harbor's wholesale rate for electricity on the statutory rate base of net investment prescribed for licensees by Part I of the Act. The rate base was found by the Commission to be $27,863,000 and the Commission allowed a 6% rate of return thereon, amounting to the sum of $1,672,000 in annual earnings for Safe Harbor above operating expenses, taxes, depreciation and rate case expense. The Commission's order requires Safe Harbor to reduce its annual wholesale rate for electricity by about $350,000 annually.

The petitioner raises questions which fall under three heads. The first is: Has this court jurisdiction to review the rate order made by the Commission under Section 20? Second: Is the order of the Commission reducing the licensees' rates invalid because made without jurisdiction and in disregard of the provisions of Section 20 of Part I of the Federal Power Act, 16 U.S.C.A. § 813? Third: Assuming jurisdiction to be vested in the Commission to make the order complained of, are the terms of that order confiscatory, arbitrary, or based on insufficient evidence?

*As to the Jurisdiction of This Court.*

The Commission issued an order on July 23, 1940 denying rehearing of the cause. Upon September 10, 1940, Safe Harbor filed a petition for review in this court under Section 313(b), 16 U.S.C.A. § 825*l*(b), and a bill for an injunction in the District Court of the United States for the Eastern District of Pennsylvania naming the United States and the individual members of the Commission as parties respondent pursuant to the provisions of Section 20 of the Federal Water Power Act of 1920, c. 285, 41 Stat. 1073, 16 U.S.C.A. § 813. The first question posed for our determination is whether this court or the District Court for the Eastern District of Pennsylvania has

jurisdiction to review the order of the Commission.

Section 313(b), 16 U.S.C.A. § 825*l*(b) provides that the aggrieved party to an order of the Commission may obtain a review of such order in the circuit court of appeals for the circuit wherein the licensee is located or has its principal place of business " * * * by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part." The subsection also states that upon the filing of the transcript the court of appeals to which the petition is filed shall have exclusive jurisdiction to affirm, modify or set aside the order of the Commission. The transcript in the case at bar was filed in this court upon October 1, 1940.

Safe Harbor contends in respect to the complaint filed by it in the District Court for the Eastern District of Pennsylvania that because Section 20 of the Federal Water Power Act of 1920, 16 U.S.C.A. § 813, provides that the persons subject to regulation " * * * shall have the same rights of hearing, defense, and review * * * " as railroad companies under the Interstate Commerce Act which includes the right of review specified by the Urgent Deficiencies Act, October 22, 1913, c. 32, 38 Stat. 208, 28 U.S.C.A. §§ 41 (subdivision 28), 43–48, the District Court possessed original jurisdiction to enjoin, set aside, annul or suspend in whole or in part the order of the Commission. Safe Harbor further contends that the District Court should have been constituted as a three judge court precisely as if it were reviewing an order of the Interstate Commerce Commission.

We entertain no doubt as was stated by the learned District Judge in his opinion in this case, Safe Harbor Water Power Corp. v. United States, 37 F.Supp. 9, 10, that prior to the enactment of parts II and III of the Federal Power Act in 1935[4] the

---

[3] The Maryland Company in turn sells the electricity to customers in Baltimore and Washington and adjacent territories. Some of the electricity is sold to the Pennsylvania Railroad Company for operating trains between Harrisburg and Philadelphia and Washington, D. C.

[4] Judge Bard also said: "The existing Federal Power Act consists of three parts: Part I is the old Federal Water Power Act of 1920 [See Act of June 10, 1920, c. 285, 41 Stat. 1063, 16 U.S.C.A.

§ 791 and preceding historical note] and the amendments under Title II of the Public Utility Holding Company Act of 1935; [Act of August 26, 1935, c. 687, Title II, 49 Stat. 838, 16 U.S.C.A. §§ 791a, 796–823. Sections 792 and 793 following section 791a are also parts of the existing Act, having been amended in 1930] parts II and III were added in this 1935 Act. [49 Stat. 847, 16 U.S.C.A. §§ 824 et seq., 825 et seq.] Part I empowers the Commission to license pow-

District Court was the only forum available for the review of orders of the Federal Power Commission regulating rates. Section 313(b) of the 1935 Act, specifically provides for review of the orders of the Commission by the respective circuit courts of appeals. The District Court concluded that Section 313(b) did not repeal by implication the older review provisions of Section 20 and that an order of the Commission might be reviewed by the district court unless a certified transcript of the record before the Commission had been filed with the circuit court of appeals as in the case at bar. In the latter event, the district judge concluded, by reason of the provisions of Section 313(b) only the circuit court of appeals might review the order of the Commission. In short, the ruling of the court below was that while both the district court and the circuit court of appeals had jurisdiction to review an order of the Commission, the jurisdiction of the latter tribunal did not attach until a' certified transcript of the proceedings before the Commission was filed with the circuit court of appeals and that when this was done the jurisdiction of the circuit court of appeals became exclusive and that of the district court to review the Commission's order necessarily terminated.

 While it is the law that repeals by implication are not looked on with favor, United States v. Jackson, 302 U.S. 628, 631, 58 S.Ct. 390, 82 L.Ed. 488, none the less, conflicts and inconsistencies between provisions of acts may necessitate such repeals. The conflict or inconsistency, however, must be plain and irreconcilable. United States v. Tynen, 11 Wall. 88, 20 L.Ed. 153; United States v. State of California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567; H. Rouw Co. v. Crivella, 8 Cir., 105 F.2d 434; Posadas v. National City Bank, 296 U.S. 497, 56 S.Ct. 349, 80 L.Ed. 351. In the case at bar the District Court held that the review provisions of Section 20 and Section 313(b) presented no indissoluble conflict. But Section 313(b) provides that the courts of appeals shall have " * * * exclusive jurisdiction to affirm, modify, or set aside [the] * * * order [of the Commission] in whole or in part." In

Jackson v. Cravens, 5 Cir., 238 F. 117, 120, it was said that " * * * where a statute provides a new, specific, and complete remedy, and fully covers the subject-matter, the provisions of the [later] statute will be looked to alone, and resort will not be had to prior existing general remedies as cumulative." In the case at bar since Section 313(b) does provide a new and specific and complete remedy fully covering the subject matter, we conclude that the review given by the section just cited is "exclusive" and that the review provisions of Section 20 must be deemed to have been repealed by implication.

Two direct appeals were taken by Safe Harbor from the District Court to the Supreme Court; one was from the judgment dismissing the complaint entered by a single judge as distinguished from the judgment to like effect which might have been entered by a three judge court. The second appeal was from the order of the District Court refusing to vacate its judgment dismissing the complaint. The defendants argued before the Supreme Court that that tribunal had no jurisdiction upon direct appeal from the district court and, if the district judge's determination that the complaint did not state a cause of action requiring a three-judge court was correct, then the Supreme Court was without any appellate jurisdiction whatsoever.

The Supreme Court dismissed both appeals, Safe Harbor Water Power Corp. v. United States, 313 U.S. 546, 61 S.Ct. 1084, 1085, 85 L.Ed. 1512, and cited cases holding mandamus and not appeal to be the remedy when a three-judge should have been convened. It then referred to Section 313(b). If we are correct in our interpretation of this decision, we think that the Supreme Court intended to convey the thought that Section 313(b) deprived the district court of jurisdiction of the cause, but in arriving at such a conclusion the Supreme Court did not have to pass upon the question of repeal by implication of the review provisions of Section 20 by those of Section 313(b). We have ruled upon that question in order that there may be certainty in this circuit.

We affirm the judgment of the court below as the proper exercise by a single

---

er projects on navigable waters, and gives it certain powers of regulation over the licensee. Part II, as added in 1935, gives the Commission jurisdiction over the transmission and sale of electricity at wholesale in interstate commerce, whether or not by licensees. Part III, likewise added in 1935, contains general procedural and administrative provisions applicable to both Parts I and II."

district judge of the court's power to dismiss the complaint. This disposes of the appeal at No. 7688.

We dismiss the appeal at No. 7689, taken from the order of the court below refusing to vacate the judgment of dismissal, because that order is not appealable.

What we have stated in this part of our opinion disposes also of the question raised as to jurisdiction of this court of the appeal at No. 7544. This is the appeal which raises the main questions and accordingly we will proceed to rule upon the substantive questions of law involved.

### As to the Jurisdiction of the Commission to Regulate the Rates Charged by Safe Harbor.

Did the Commission have jurisdiction under Section 20 to regulate the wholesale electric rates charged by Safe Harbor? We have indicated that the greater part of the electricity generated by the hydroelectric units operated by Safe Harbor goes from Pennsylvania into Maryland and therefore moves in interstate commerce. Congress possesses the authority to regulate the rates charged for such electricity. None the less there are two questions for our determination. The first is what was the intention of Congress. The second is could Congress do what it intended to do. We will endeavor to answer the first question first.

It must be borne in mind that Safe Harbor was licensed under Section 19 of the Act, 16 U.S.C.A. § 812, by the Federal Power Commission to operate its hydroelectric units upon the Susquehanna River. Without the license of the Commission the power company could not function at all. Section 19 provides as a condition of the issuance of the license that the licensee " * * * shall abide by such reasonable regulation of the services to be rendered to customers or consumers of power, and of rates and charges of payment therefor, as may from time to time be prescribed by any duly constituted agency of the State in which the service is rendered or the rate charged." It goes on to state that in case power created by the licensee is used in public service within a state which has not set up a commission empowered to regulate and control services and rates then "it is agreed as a condition of such license" that jurisdiction to regulate rates and services furnished by the licensee or by its customer is in the Commission which retains such regulatory power until the state has set up a commission for regulation.

In the case at bar regulation is sought by the Commission under the provisions of Section 20. The pertinent portions of Section 20 provide that: "When said power or any part thereof shall enter into interstate or foreign commerce the rates charged and the service rendered by any such licensee, * * * or by any person, corporation, or association purchasing power from such licensee for sale and distribution or use in public service shall be reasonable, nondiscriminatory, and just to the customer and all unreasonable discriminatory and unjust rates or services are hereby prohibited and declared to be unlawful; and whenever any of the States directly concerned has not provided a commission or other authority to enforce the requirements of this section within such State * * * or such States are unable to agree through their properly constituted authorities on the services to be rendered, or on the rates or charges of payment therefor * * * jurisdiction is hereby conferred upon the commission, upon complaint of any person aggrieved, upon the request of any State concerned, or upon its own initiative to enforce the provisions of this section, to regulate and control so much of the services rendered, and of the rates and charges of payment therefor as constitute interstate or foreign commerce * * *."

It will be observed how very similar in one major particular the provisions of Section 19 and 20 are. Regulation of power is to be encompassed through state authority and not through the power of the Federal government unless the state has failed to set up a regulatory commission. Only in the event of such failure does the Federal Power Commission possess jurisdiction to regulate rates and services.

It is contended by Safe Harbor that since Section 20 states that the Federal Power Commission shall have regulatory jurisdiction only when a state or states concerned "has not provided a commission or other authority to enforce the requirements of this section within such State * * * or such States are unable to agree through their properly constituted authorities on the services to be rendered, or on the rates or charges of payment therefor * * *", the contingency specified is not one growing out of the constitutional impotency of a

state to make its commission's actions effective, but rather the simple failure of a state to set up a regulatory agency. In other words if a state regulatory agency or state regulatory agencies have been set up it is immaterial whether or not the state agency or state agencies possess the constitutional power to deal with the regulation of hydroelectric power in interstate commerce unless they are unable to agree as to how they would regulate something in respect to which they are impotent.

This would be a curious emasculation of the statute. Congress intended the contrary and this is indicated from the words employed in Section 20, "a commission or other authority to enforce * * * or to regulate and control * * *". It was the intention of Congress that there should be regulation and control of hydroelectrical energy and not that impotent public bodies would be set up by the states to go through the motions of regulation. The petitioner's view in this regard is not supported by the legislative history of the section. Section 20 as originally submitted to Congress [5] did employ the words, " * * * whenever the States directly concerned have not the authority individually to take action or are unable to agree through their properly constituted authorities * * *", subsequently stricken out in favor of the present words of the Section, but the debates and reports [6] indicate quite clearly that Congress proposed in fact to regulate hydroelectric power and not make vain gestures of regulation.

The question is whether Congress intended to regulate interstate commerce in hydroelectric power by the Federal Power Commission or through the medium of state commissions. Put thus baldly, the first reaction might be that Congress intended to regulate interstate commerce in hydroelectric energy by a federal agency leaving to the state commissions intrastate regulation. But such a conclusion flies in the face of the words of Section 20. The section is expressly intended for the regulation of hydroelectric power which "shall enter into interstate or foreign commerce". It speaks of the states "directly concerned" and of states directly concerned being "unable to agree through their properly constituted authorities on

the services to be rendered, or on the rates or charges of payment therefor * * *". Moreover, the debates and reports show that the members of Congress were thinking in terms of state regulation of interstate hydroelectric power. Senator LaFollette, a member of the special Water Power Committee, stated, Congressional Record, Vol. 56, Part 9, p. 8932, "The only place where the government interferes between the States is where they have not any commission, and if there is any charge of monopoly usually it is the fault of the State and not the fault of this law or the Commission." The use of the phrase "between the States" is particularly indicative of what was in the mind of Senator LaFollette. See also the statement of Representative Lee, who said, Congressional Record, 66th Cong. 2nd Sess., Vol. 59, Part 7, p. 6528: "The bill provides that the regulation of rates, of service, and of issuance of securities shall be exercised by the several states whenever they have established agencies with the necessary authority." The emphasis here is again on agencies of states, indicating clearly the thought that hydroelectric energy would pass from one state to another and be regulated in the states by the states.

We conclude that it was the intention of Congress to regulate hydroelectric power by state commissions using the federal agency set up in Section 20 only where the state commissions did not or could not perform the function expected of them.

Could Congress provide for the regulation of hydroelectric power coming into the states in interstate commerce by state commissions? This is the vital question for our determination, but before it can be answered another inquiry must be made. Are the generation, transmission and consumption of hydroelectric energy matters of such national concern as to require regulation solely by the Federal government? This question is capable of being answered either in the affirmative or in the negative, depending on circumstances. The transmission of power from state to state may be such a matter of national concern as to require regulation solely by a Federal agency, while on the other hand the consumption of that power in the state to which it has been transmitted may be pure-

---

[5] It was originally introduced by Senator Shields on April 9, 1917, as S. 1419.

[6] See Congressional Record, Vol. 56, Part 9, pp. 8932, 9044, 9110, and H.R. No. 61, 66th Cong., 1st Sess.; Congressional Record, 66th Cong., 1st Sess., Congressional Record Vol. 58, Part 3, p. 2238.

ly a matter of local interest. The principle of Public Utilities Comm. v. Attleboro Steam & Electric Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549, would govern the first situation; that of Pennsylvania Gas Co. v. Public Service Comm., 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434, the second. Section 19 deals with the development, transmission and distribution of power in public service. Section 20 concerns itself primarily with regulation and control of services and rates within a state of hydroelectric power which hás entered that state through interstate commerce. It deals also with regulation of such power through state compact, reserving jurisdiction to the Federal Power Commission where the state authorities are in disagreement.

■ There is no doubt that Congress cannot delegate the power of the central government to regulate interstate commerce to a state or state agency. It should also be borne in mind that in the case at bar we need not concern ourselves with the doctrine of the silence of Congress [7] for Congress has spoken in Section 20. When Congress enacted Section 20 in 1920 it had before it the decision of the Supreme Court in the Pennsylvania Gas Co. case. When Congress reenacted the Section in 1935, the Supreme Court had decided not only State of Missouri v. Kansas Natural Gas Co., 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027, but the Attleboro case as well. But there always has been a field where, Congress permitting, the police powers of the states might operate. Examples of this are manifold. This has been true in many cases even where state action apparently has been in conflict with Congressional action [8] and the Supreme Court has held none the less that there remains a regulatory field in which the state may act. A cogent illustration lies in the decision of the Supreme Court in Clark Distilling Co. v. Western Md. Ry. Co., 242 U.S. 311, 325–332, 37 S.Ct. 180, 61 L.Ed. 326, L.R.A.1917 B, 1218, Ann.Cas.1917B, 845, passing upon the application of the Webb-Kenyon Law, 37 Stat. 699, 27 U.S.C.A. § 122, which held in effect that Congress might throw an interstate shipment of intoxicating liquors into intrastate commerce as it passed the state line, the use to which the shipment was then to be put becoming a matter of local concern and the police power of West Virginia operating in respect to it. There is an analogy between the Clark Distilling case and that at bar for the consumption of power is a local matter, almost as if a package of power had been delivered at the state line. The case at bar, however, is a stronger case for the exercise of state police power for in the instant case Congress has spoken and specifically has given permission for the exercise of state power. There is a field in which state power may act upon the products of interstate commerce and though that field is difficult to delimit we think that Congress intended to base Section 20 upon it and could do so without violation of the commerce clause of the Constitution. Indeed, if only one state or one state agency was concerned in the case at bar, we would conclude that the decision of the Supreme Court in the Pennsylvania Gas Co. rather than that of the Attleboro case was governing.

■■ In the instant case it is necessary to go one step further, however. While the Public Service Commission of Maryland within the doctrine of the Pennsylvania Gas Co. case can regulate the rates and services charged for the hydroelectric energy generated by Safe Harbor and consumed in Maryland or delivered at the district line at Takoma Park for the District of Columbia, and the Pennvlvania Public Utility Commission likewise can regulate electrical energy designed for consumption in Pennsylvania, it is obvious that there must be cooperation and agreement between these two state authorities if there is to be a really effective regulation of rates and services for the hydroelectric energy with which we are concerned. In short the power generated by Safe Harbor and used in Pennsylvania and Maryland must be treated as an integrated whole. Otherwise either state commission might impose unreasonable regulations or service schedules for the benefit of their respective citizens. The compact clause, clause 3 of Section 10 of Article I of the Constitution of the United States, affords the opportunity to the respective state commissions of Pennsylvania and Maryland to regulate under their police powers these rates and services as part of an integrated system of hydroelectric energy. We think that this was what Con-

---

[7] See "The Silence of Congress" by Henry Wolf Bicklé, 41 H.L.R. 200, and the authorities therein cited.

[8] See "The Compact Clause", by Messrs. Frankfurter and Landis, p. 1641, Vol. 3, "Selected Essays on Constitutional Law", and note 136 wherein the authorities are collected.

gress intended when it enacted Section 20, and with the permission thus accorded, the two states concerned are at liberty to regulate these rates and services constitutionally and lawfully. Such a result is in line with the decision of the Supreme Court in the Pennsylvania Gas Co. case.

Section 20 conveys the consent of Congress to the states to make agreements of cooperation under the compact clause. They may so act under it. The subject matter of such a cooperative compact is one in which " * * * Congress must exercise national supervision through its power to grant or withhold consent, or to grant it under appropriate conditions." [9] The foregoing quotation contains the essence of what we have stated heretofore. In the case at bar in the absence of a finding by the Federal Power Commission that the States of Pennsylvania and Maryland " * * * are unable to agree through their properly constituted authorities on the services to be rendered, or on the rates or charges of payment therefor * * *", jurisdiction to regulate remains in the state commissions of those states and is not in the Federal Power Commission.

Congress made the jurisdiction of the Federal Power Commission to regulate hydroelectric energy under Part I of the Federal Power Act dependent upon the inability of the states concerned with the electric energy to agree upon its regulation. Such an agreement would be a compact. The word "compact" is high-sounding and usually associated with an extensive body of official formulas, but we conclude that a compact like an agreement may be deemed to arise out of actions which are quite informal, Chief Justice Taney in the case of Holmes v. Jennison, 14 Pet. 540, 572, 614, 10 L.Ed. 579, 595, 618, indicated this when he stated, " * * * we can be at no loss to comprehend the intention of the framers of the Constitution in using all these words, 'treaty,' 'compact,' 'agreement.' The word 'agreement,' does not necessarily import any direct and express stipulation; nor is it necessary that it should be in writing. If there is a verbal understanding, to which both parties have assented, and upon which both are acting, it is an 'agreement.' And the use of all of these terms, 'treaty,' 'agreement,' 'compact,' show that it was the intention of the framers of the constitution to use the broadest and most comprehensive terms; * * *." If Pennsylvania and Maryland, through their respective public service commissions, have agreed informally, by cooperative or identical actions, to regulate as an integrated stream of electricity the hydroelectric energy produced by Safe Harbor and consumed in Pennsylvania and Maryland, we would conclude that such would be within the purview of the compact clause and the permission given by Congress by Section 20. The record in the case at bar is silent upon the specific subject of joint regulation by the state commissions of Pennsylvania and Maryland but does show regulation by these commissions over a period of years. Such regulation may have been by cooperative action between these state commissions and may constitute the reason why the Federal Power Commission made no finding that the States of Pennsylvania and Maryland by their respective commissions were unable to agree on the services to be rendered by the power company or on the rates or charges of payment therefor.

In reaching these conclusions we are not unmindful of the Report to Congress made by the Federal Power Commission in which an opinion of the Chief Counsel to the Secretary of the Commission reaches an opposite result.[10] Though we think that the opinion of the Commission and its counsel is entitled to great weight, we are unable to agree with the views expressed by the Commission in the case at bar in respect to the application of Section 20. Though Congress had the opinion before it in 1935 when the Federal Power Act was passed, the Commission's views on this subject (if they were as are now asserted by the Commission) had not been enforced by actual order and for this reason represented theory rather than practice. We conclude that this portion of the Report cannot be given the same weight as if it furnished a specific ruling put in practice by the Commission.

---

[9] "The Compact Clause" by Messrs. Frankfurter and Landis, p. 1616. See note 8 supra. The balance of the quotation is as follows: "The framers thus astutely created a mechanism of legal control over affairs that are projected beyond State lines and yet may not call for nor be capable of, national treatment. They allowed interstate adjustments but duly safeguarded the national interest."

[10] See the Ninth Annual Report of the Federal Power Commission to Congress, (1929) pp. 89, 90, 119–131.

In conclusion we state that whether or not the Federal Power Commission has jurisdiction over Safe Harbor as a public utility transmitting and selling electric energy at wholesale in interstate commerce under the provisions of Part II of the Federal Power Act, 16 U.S.C.A. § 824 et seq., is immaterial. The Commission has chosen to fix the rates charged by Safe Harbor under the authority which Section 20 confers upon it with respect to licensees of water power projects upon navigable rivers which is an entirely different basis for Federal jurisdiction. Regulation of electrical energy created by boiling water, carboelectrical energy, and regulation of electrical energy created by falling water, hydroelectrical energy, present a subject for reflection under the respective provisions of Parts I and II of the Federal Power Act, but are not properly in this case.

In view of what we have decided it is unnecessary to pass upon the third question presented by the appeal: Whether or not the Commission's order is confiscatory, arbitrary, or based on insufficient evidence.

The order of the Federal Power Commission is set aside as beyond its jurisdiction.